Reconfigured our panel, and we will call the last case before the noon hour. 13-2737, People v. Anthony Correa. Will both attorneys that are going to present oral arguments please step up and identify yourselves for the record. Good morning, Your Honor. James Jacobs, Public Defender's Office for Mr. Correa. Good morning, Mr. Jacobs. Assistant State's Attorney Brian Levitsky for the People of the State. And Mr. Levitsky, you've been here before, haven't you? Yes. All right. Mr. Jacobs, Mr. Levitsky, each of you will have approximately 15 minutes for your argument, and from that, Mr. Jacobs, you can save up some time for rebuttal. All right. I would like to do so. Okay. Let's proceed then. May it please the Court, Counsel, again, James Jacobs, Public Defender's Office, representing Mr. Correa. I would like to reserve five minutes for rebuttal. All right. Mr. Correa was charged based on an incident that occurred on October 29, 2009, where Mr. Correa momentarily grabbed a 9-year-old girl at a playground near his home. He was charged with attempted aggravated kidnapping, aggravated battery, a child abduction, and unlawful restraint. But Mr. Correa was found unfit. After treatment failed to render him fit, the trial court conducted a discharge hearing. After the discharge hearing, Mr. Correa was found not, not guilty of attempted aggravated kidnapping, child abduction, and unlawful restraint. He was found not guilty of aggravated battery. After the discharge hearing, the trial court determined that Mr. Correa posed a serious threat to public safety, which warranted confined treatment, and he was remanded to the Department of Public Health, where he remains to this day. On appeal, Mr. Correa raises two issues. The first issue concerns the finding of not, not guilty to the charges of attempted aggravated kidnapping and child abduction. The standard review here is whether any reasonable, whether any rational finder of fact could have found the elements of the offense beyond a reasonable doubt. So it's a simple reasonable doubt argument. The second issue concerns whether the trial court's findings that Mr. Correa posed a serious threat to public safety to warrant confinement was appropriate. And the standard review here is whether this finding was against the manifest weight of the evidence. I would like to address both of these issues, concentrating primarily on the first issue. All right. The charge of attempted kidnapping, as charged in information and by the statute, required the State to prove that Mr. Correa had the specific intent to take Crystal from the playground and secretly confine her in his home. The charge of child abduction required the State to prove that Mr. Correa intended to lure Crystal to his house for an unlawful purpose. So the crucial fact for both of these charges is where Mr. Correa was going to take Crystal and what he was going to do with her once he got there. The where was the house, and the what was the secret confinement and unlawful purpose. Now, while I know Your Honors have read the record, both of these issues are particularly fact-driven, so I'd like to go over some undisputed facts. With respect to Mr. Correa, he was 44 years old at the time of this case, at the time of this incident in October of 2009. He had no history of violence or predation. He had trespass and theft arrests. He had an IQ of 56.56, and as explained by the doctors, this placed him in the extremely low range. Everybody pretty much agrees that as far as the actual intelligence quotient, he would be perhaps like a child from an age between 6 and 11 in terms of mental development. Well, and ironically enough, he would be considered a child for purposes of definitional statutory purposes under the child abduction statute, and would also receive greater protection under the attempted aggravated kidnapping statute. So that's just an ironic aside. He did have a developmental age in those ages that Your Honors mentioned, and he was on disability and had been for his entire life. And while he could dress and feed himself, he needed the support of his loving family, and that's who supported him and supervised him. He had fair impulse control, but was very childlike in his demeanor. Of the three doctors who examined him a total of five times, and these are Drs. Jasinski, Dr. New, and Dr. Kim, all found that he was not a violent person and that he posed no risk to himself or others. And significantly, all three of the doctors recommended outpatient treatment. So those are Mr. Correa's broad personal characteristics. The facts concerning the incident and what was required in the state's proof are also, for the most part, undisputed. Mr. Correa rode his skateboard to a park near his home where he'd been before and saw a 9-year-old girl named Crystal and her 12-year-old brother Frank. Mr. Correa knew both children because he lived in the neighborhood. So Mr. Correa did not approach someone that he did not know. Rather, he saw someone that he had seen before and approached them. Mr. Correa offered Crystal some candy that he had in his hand and then made a statement about more candy. When Crystal refused the candy that Mr. Correa had in his hand, Mr. Correa grabbed Crystal's belt loop and wrist. Crystal screamed and Frank, her brother, 12-year-old brother who was standing a few feet away, immediately came over and slapped Mr. Correa's arms and Mr. Correa ran away. The thing that's crucially in dispute is what Mr. Correa said about candy just prior to grabbing Crystal. Well, isn't it your contention that the last thing she said, first of all, I think you've pointed out in your brief that prior to any testimony in court, she never, her statements prior to that were that there was no mention of a house or going to his house. And then at trial, she did mention this idea about a house on direct. But then on cross, she indicated that she did not or that he did not mention going to his house or home. That's correct, Your Honor. And that was the last kind of testimony she gave because there was no redirect. That's correct. All right. So she actually made the six statements, the two prior to trial, no house, and then two during direct prior to the reference that Your Honor made where she just said, do you want some candy? And then further on in direct is where, with the aid of significant prompting, is where she mentioned the house. So the problem in this case is not just inconsistent, contradictory testimony, which it is, but it's trying to divine the actual content of what her testimony is. But the trial judge kind of teased all that out, didn't he, in his finding of a non-acquittal, I guess we'll call it. He acknowledged that the testimony was contradictory, but that he thought she was being credible. And he even said, I looked at her face, I considered her demeanor, and I believe that the reference to the house was made. Well, that's why we're here, Your Honor. And I believe that no rational finder of fact could have listened to six statements and five of them don't say anything about a house. And the only statement that says anything about a house is teased out and made with significant prompting only after two prior times on direct. She just says, do you want some more candy? There's a big difference, isn't there, between the proof needed for child abduction and attempt to aggravate a kidnapping? Well, they both, as framed in the information, because there was no indictment, as framed by the information, it required, the aggravated kidnapping required secret confinement in the house. For respect to child abduction, it required that he wanted to lure her to a house for an unlawful purpose. I'm sorry? It's a dwelling. Dwelling, yes. Broader term than house, I think. It is. But also that requires, you know, without the consent of the parent. But in this case, there was testimony specifically that the parent did not consent, wasn't there? Sure. Isn't there a big difference in the classification of the offenses as well? Yes. Aggravated kidnapping, attempt to aggravate a kidnapping is a class one and child abduction is a class four. Is a class four if it's a first offense. And a second conviction, it's a class three. And the sentencing range, obviously, is quite different. Four to 15 for the attempt to aggravate a kidnapping and one to three for child abduction. And Mr. Correa has been in continuous custody since November of 2011. To this day, he's timed out for both either the child abduction or the unlawful restraint. And again, not challenging the finding of guilty of the unlawful restraint. Because it's clear that Mr. Correa wanted Crystal to go with him, but the issue was where was he going to take her and what was he going to do once he got there? So then you're agreeing that he wanted her to go with him? Yes, sure. All right. That he grabbed her, grabbed her loop and her belt loop and her wrist. But Dr. Kim gave, I think, a good explanation for why Mr. Correa would do this. And that was that he had childlike tendencies. Childlike impatience. Impatience of someone between the ages of five and 11. That someone who has poor, fair impulse control. And what child is not impatient and wants it done right away and it was not a violent act. The unlawful restraint requires a knowing act, but the other two felonies require intention. Yes, Your Honor. Yes, Your Honor. You want to move on to the aspect of the sentencing? You mean whether he should have been confined or not? Yes. I can do that, yes, Your Honor. I don't believe that. But if you have more to say on whether or not the not not guilty should be reversed based upon the one statement. Well, and actually, he routinely offered candy to people as a friendly gesture. There's evidence in the record that he offered candy to the correctional officers who were escorting him for the fitness interview. And that's on page volume three of the records common law 59. Yes. So he had these childlike tendencies and his way of offering candy was saying, I like you and I want to be your friend. And this was, and so even the construction of, if he had more candy at his house, if he made it, is subject to more innocent constructions. It was two days before Halloween. It's October 29th, two days before Halloween. He certainly had more candy at his house. Crystal shouldn't feel bad about taking the candy that he was offering him, offering her, even if he said that, because he had more at the house. But even, so I believe Your Honor should reverse the finding of. I'm not guilty on the two charges, so. Yes. All right. And because he's been in custody for more than the time, Your Honor should order his immediate release. With respect to the finding of a threat to public safety and whether inpatient treatment was appropriate, the State had the burden to establish that Mr. Cree opposed a serious threat to public safety. But the only person who held that belief was Mr. Michael Jasmine, and the reasons he provided were insufficient. With the exception of Mr. Jasmine, who was not a doctor, qualified, he'd been director down here for 34 years. He was a clinical psychologist. Yes, he was a clinical psychologist. There really wasn't a question about his expertise. No, but I'd just throw that in, because I have three doctors who say that Mr. Correa was not a threat and opposed no threat of violence. Yes, and there are testimonies in the record. Yes, Your Honor. Wasn't Mr. Jasmine's main concern that Mr. Correa should go through this training or education as far as the sexual? It was called prosocial sexual classes. Right. And the reason why he wanted him to do that and why I think that's insufficient for Your Honors to uphold the decision of the trial court and why it is against the manifest way of the evidence is that Mr. Jasmine didn't know what Mr. Correa was thinking. He didn't know whether he was a threat or not. None of the incidents that Mr. Correa, there's no history of Mr. Correa ever having a sexual motivation or sexual content to his behaviors in any way, shape, or form. That has not been alleged. Was it proper at this hearing for the trial court to consider this other incident with the 13-year-old girl in the bathroom? I would say that it was not improper for the judge to consider that, but I think he overly considered that. And I think that there's a portion of the record where it's a very interesting exchange between Dr. Kim and the trial court with respect to what Dr. Kim's impressions were with respect to this other incident. And Dr. Kim was not aware of the incident. He said, well, tell me what happened. What happened during the incident? And could say nothing because the 13-year-old girl and her mother said nothing happened. He wasn't charged with even a sexual offense in that circumstance. It was trespassed the land. And in direct answer to Your Honor's question, I don't think it was inappropriate. It was certainly part of the record. It was part of the mix. It was something which I don't think the court could consider. Justice McBride makes a good point here that the judge didn't just say, I find this person to be incredibly dangerous. What he said was, I'm concerned about the fact that he refuses to participate in this training. They answer these questions, take these tests, whatever, about psychosexual whatever. He had before him one incident where he grabbed a 6-year-old girl on the playground, another instance where he was sort of curiously found in a girl's bathroom with a 13-year-old girl. No charges pressed with regard to a sexual offense, but nobody thinks that's a normal thing to find. He's got both of those things. And when Mr. Jasmine was trying to sort of probe all this and talk to him about this stuff, try to get a sense of this individual, this 44-year-old man, he wouldn't answer. And maybe, as you say in your briefs, he's a kid. Kids don't like to talk about that stuff. But that doesn't change the fact that Mr. Jasmine and the trial judge seem to think, we've got to get that figured out. We've got to have a little bit better of a handle on this before we allow a release of this gentleman. Well, my nice little sound bite for that response would be, I don't think he can be presumed dangerous any more than he can be presumed guilty. And the judge and Mr. Jasmine just did not know. And there's nothing in the record to establish that there was sexual motivation. Sexual motivation is what Your Honor is referring to and what, as a court and society and the judge, should be concerned about. But there was nothing in there and nothing in the record to suggest the sexual motivation where they had sexual feelings towards little girls. He was 44 years old. If anything, this would have developed prior to this time. It's not like he went through puberty less than two years ago. He's 44 years old. So I don't believe that Mr. Jasmine's opinion concerning that he might be a threat in the face of other indicia that he could have been a threat is appropriate to, or sufficient to support the State's clear and convincing burden to establish that he was a serious threat to public safety. It wasn't as if the choice for the judge was between Mr. Correa being in inpatient care or being left out on the street. Mr. Correa has a loving and supportive family. Mr. Ricardo Correa, a former Cook County State's attorney and now property manager, testified credibly that he would take care of Mr. Correa if released to his supervision. He would have the assistance of other family members, including Elsa Rubio, his girlfriend, who is a 25, double master degree, 25-year Chicago Board of Education administrator. What about that facility, though, during the daytime where he would be spending several hours? Can you tell us anything? The El Valor? Yes. That was a facility which Mr. Correa, Ricardo Correa, said that he went to. They did arts and crafts for like six hours a day. I don't know if Your Honor is asking whether I know whether that facility was secured or not. I think it's more of a voluntary situation, isn't it, that he would go there and there wouldn't really be any kind of secure setting in terms of his being there from a certain time until later in the afternoon. I just wondered if there's any more information. I probably don't know the answer to that direct question, whether there was locks on the doors of the El Valor Center. Mr. Correa, and by the way, Mr. Ricardo Correa, Elsa Rubio, they're present in court today. Their support continues to this day. They are willing and want Mr. Correa to come home. Mr. Correa, Ricardo Correa, did testify that he would drop off Mr. Correa, that they would, that he would. That's all in the record. Yes. I don't know the answer to your direct question about whether it was secure or not. In short, Mr. Correa posed no serious threat to public safety. Is there any wavering of the three doctors that you presented or that were presented that in any way suggested that they had concerns about commitment, that they believed that his release should have been outpatient? No, there wasn't. But I also want to be fair about this because the three doctors who evaluated Mr. Correa did so in the context of a fitness hearing. Yes. Mr. Jasmine was the only person who actually testified at this discharge hearing. Now, their testimonies were considered by Mr. Jasmine and the court, so they are certainly in the record and go into whether the finding is against the manifest weight of the evidence. But I don't want to create the false impression that those doctors testified at the discharge hearing that he was not a threat to public safety. The trial court did consider that discharge hearing? Yes. Dr. Kim and Dr. Jasinski. He certainly did. I forget their names, but the other doctors who testified. Drs. Jasinski, New, and Kim. So in conclusion, Your Honor, should reverse the finding of guilt with respect to attempted aggravated kidnapping and child abduction, and in the alternative, find that the finding that he was a serious risk to public safety and should be committed be reversed as well. All right. Thank you. We'll give you some time for rebuttal, and now we'll hear from Mr. Levitsky. May it please the Court again, Brian Levitsky, Assistant State's Attorney, on behalf of the people of the State of Illinois. I will also address both issues, focusing again on the first, but I'll be happy to answer any questions that the Court has. A rational trier effect in this case could have found from all the evidence that the people presented  attempted aggravated kidnapping and child abduction. How would you best argue that there was testimony in this record actually supporting that Mr. Correa committed this attempt, aggravated kidnapping, with intent to carry her from one place to another, but more importantly, with intent secretly to confine her against her will? So with respect to the carrying her away by force, this wasn't? No. I think what I really want to know is how do you support with intent secretly to confine her? These are inferences that the trial court had to make based on the circumstances surrounding the offense. And what happened here was the defendant approached Crystal with what appeared to be smarty centers and he offered her the candy and her words on direct examination were, do you want some candy? I have some more at my house. So how does that translate into an intent? Even if we take those words and we accept them for their content, how do you translate that into an intent secretly to confine her against her will? The inference from these facts is that the defendant was going to take Crystal from a public park either to his house or to a candy store or someplace against her will because she refused him when he was grabbing her. She didn't take a step, but she also said that she did not feel like she could escape. She had to call to her brother to intervene to smack the defendant's hands off of her. And so the defendant's pulling at her in a direction that she didn't want to go, saying that he was going to take her to some other place. Well, now you're adding some things, aren't you, a little bit there? Telling her you were going to take her to someplace she didn't want to go? I mean, the words are very limited in the record. They are. Again, her exact words were, do you want some candy? I have some more at my house. Coupled with his pulling on her, both of these lead to the inference that he was going to take her someplace. She did not want to follow him wherever it was the place, whether it be a house or whether it was a candy store. These are both places that would be away from the public park where she was at that she did not want to go. Her brother Frank was just a few feet away? She testified that I believe Frank was on the swings, but her cousin Tarina, who was younger than her, was five feet away. Did the evidence talk about how many other people were in the park that day? I believe the evidence only referred to her cousin Tarina. It was by Crystal, her cousin Tarina, and her brother Frank. So how was he going to slip this girl away with him right in front of her relatives, her siblings, her uncle, and others? With his skateboard? How was he going to steal her off? Well, he could have walked away without the skateboard. The charge was that he was attempting to commit an offense, not that the offense was completed. No, I understand that, but your theory of the case has to be that that was his ultimate goal, to drag her away. I mean, we're talking about a 44-year-old man, but we're also talking about a five-year-old at the same time. Would you agree with that? Crystal was nine years old. No, I don't mean that. I mean the same person. The 44-year-old man is also a five-year-old child, or a 10-year-old child. It was five to 11, wasn't that the range we were talking about? He had the physical strength of a 44-year-old man. There was no question to his motor skills or to his physical strength. He had the emotional age of a five to 11-year-old. So this five to 11-year-old is planning in front of half of her family to drag her to his house, and he thinks he's going to get away with that? That's a reasonable inference from the evidence that he was pulling on her, that she didn't want to come with him, that he had mentioned some other place that wasn't the public park, that he was going to give her candy or that he was going to buy her candy. The element is intent to secretly confine her? Because it's an attempt, it's the intent to commit the offense and the intent to secretly confine her. Given the mental age of the defendant, how are you able to conclude that? How are you able to find that? It's an emotional age, which was considered by the doctors who were trying to figure out whether or not the defendant was fit to stand trial. Whether or not someone with an emotional age of five to 11 years old could form the specific intent was not a question, which any of the doctors offered their opinion as to because it was never asked. And so what we're left with is a record where a man approached a nine-year-old girl, put his hand on her wrist and on her belt loop, and tried to pull her in a direction that she didn't want to go, made an office of candy, and said he was either going to take her to his house or to his store. Do you think that the Williams case, is that the one you cited? Yeah. Do you think that really supports the facts here? Because in Williams, the adult male in that case wasn't really mentally challenged at all, was he? No. So I mean, is there a case you think that we could be guided by that would be perhaps more analogous to these facts? Because I don't think there's any question that Mr. Anthony Correa, his intelligent emotion is of record, and that places him in a category with basically children emotionally and perhaps in other ways as well. But what case would you guide us to look at to compare it that would suggest that this finding was supported by the evidence? I think that People v. Ty, which says that you can infer the defense intent from the circumstances, is relevant. Which one is that again? It was People v. Ty. It was a Supreme Court case. But was there a mentally challenged individual being charged in that case? No. But there's no evidence on the record that an individual who had the emotional age of a 5 to 11-year-old could not commit this offense or could not form a specific intent. Now, the child abduction charge is an attempt. It's actually intentionally lured or attempted to lure without the consent of a parent. So do you agree that's a little different than your attempt, aggravated kidnapping offense? It is. The statute specifically requires, as you noted earlier, that it's into a dwelling place. Right. And there's the added element of the absence of consent and the luring. What do you say to counsel's questions about, or his statement, that of the six statements that the young woman made, the little girl, I should say, rather, that her previous statements before testifying never mentioned a home or a house or a dwelling. And then at trial, she initially mentioned his statement about, I've got more at my house. But then on cross, she said he never said that. Sure. I have two responses. The first is that, as this Court noted earlier, the trial court made very specific fact-finding on this. And the trial court said, this is in the record at L59-60, her demeanor was such that she did not appear to be telling a lie to tailor her testimony to fit the allegations of the charging document. She admitted readily that she didn't mention the house to the police officer on the scene, and she admitted that she said to an investigator, come to the store with me now, I'll buy you some candy. The trial court nevertheless found that she testified credibly on direct examination when her own words were that the defendant said, do you want some candy? I have some more in my house. And my second response would be that the charging instrument, the information here, said for attempt at aggravated kidnapping that the defendant attempted to secretly confine her at her house. But it's not listed in the statute that that's an element of the offense, and it's not listed in any of the issues instructions, the only pattern instructions. So although it was in the charging instrument, there would be surplusage. What are you telling us? That even if she was incredible on her statement, that the defendant said that he had more candy at his house, it was still a violation of, in a criminal setting, it would be an attempt at aggravated kidnapping. But you still have to establish that his intent was to secretly confine her against her will. That's correct. It's one of the elements. Isn't it? Yeah. You're saying it doesn't have to be at the house, is that your point? No. For attempt at aggravated kidnapping, it was charged at his house, but the statute only says secretly confined. It does say the wrong place for child abduction. And if there are no further questions on that issue, I'll just briefly address the second issue. And the trial court did not know how to specifically air when it committed a defendant based on the evidences presented by Mr. Jesmond. He was not a doctor, but he was a clinical psychologist, and he was asked directly by the trial court, based on his evaluations of the defendant, whether he constitutes a serious threat to public safety if he's living alone in the community. And Mr. Jesmond said yes. The doctors who evaluated the defendant previously were evaluating him for his fitness to stand trial. They were not considering whether or not he would be subject to this prong of the discharge statute. But they all agreed he would never obtain fitness, didn't they? They agreed that he would never obtain fitness. So he was never going to be really fit. Not being able to obtain fitness means that you can't really understand the charges against you, and you can't really cooperate with your attorney, doesn't it? Isn't that what the fitness standard is? Yes. But the question for whether or not he should be committed under 10425G2 is whether he constitutes a- A danger. A danger to public safety. Right. And this wasn't just about sexual dangerousness. The item that Mr. Jesmond listed under defendant's treatment plan was a defendant who identified age-appropriate relationships and how interactions both socially and sexually with people of different ages varies. And so the concerns that if a breakdown of defendant's supervision were to occur, that he would, again, be likely to commit something that would otherwise be a Class I felony, was a reasonable conclusion for the Trial Court to draw. Wasn't Mr. Jesmond's concern that he undergo this education process before being conditionally released or released to a family member? Isn't that one of his major concerns? I believe that's correct. But doesn't the entire record suggest that this type of training would perhaps never reach the mind of Mr. Correa? Well, I mean, they established that he would never be fit to stand trial, which means he wouldn't understand the abstract legal concepts of what is the role of a trial judge? How do you assist your counsel in preparing a defense? There isn't any evidence that defendant couldn't understand age-appropriate relationships with people of different ages. And Mr. Jesmond also testified that he believed, even with defendant's emotional age of 5 to 11 years old, that he was still emotionally capable of attending that class. And he was aware of all of the reports that Drs. New and Kim and Jasinski had prepared in this case. But when they were all giving their opinions about fitness, they all had the opinion that the least restrictive, most therapeutically appropriate treatment setting for Mr. Correa would be an outpatient treatment facility. Isn't that true? That's correct. All right. So do you think that that's different or that it doesn't have any impact on this, even though that was presented at the fitness hearing, as opposed to the determination of whether or not he should be physically released? Sure. The doctors who were evaluating him were looking for different things, asking him different questions. It was Mr. Jesmond who was considering the issue of whether or not the defendant was going to do something like this again. The other doctors clearly did not find this person to be dangerous, did they? They didn't find him to be in immediate danger in need of immediate psychiatric hospitalization. But they were recommending outpatient. They were. They were saying he could have his liberty, he could have his freedom. Right. They were considering what's the least restrictive, most therapeutic setting for restoration services. Least restrictive appropriate one. I mean, they wouldn't have recommended that, I assume, if they thought he was a sexual predator. They weren't asked to determine that. And Dr. Elissa… Isn't that sort of implicit? I mean, they were recommending outpatient therapy. Why would they recommend that if they thought he was a predator? When Dr. Neal was asked about whether or not he should be nevertheless civilly committed, he said a formal opinion would require additional evaluation. And Dr. Ken said, after being made aware of the misdemeanor charge, that he would still need more information to determine whether the defendant was at risk for sexual dangerousness. Neither of these actors wanted to go beyond the questions that they were asked to determine, which was appropriate for them to do. And the trial court did not manifest that error. It said, this is on 48 to 49, that its concerns were immediate concerns. The trial court was concerned that the defendant gets the kind of education he needs so that there's a possibility he can return to the community, and ultimately that is the goal here. But until I am convinced that there can't be a breakdown in his supervision, so that something like this can't happen again, this is where we're headed. And so I think the trial court did not manifest that error when it relied on Mr. Jasmine's expert opinion that the defendant required this education and that it was a reasonable conclusion that the supervision, which could break down for whatever reason, would potentially pose another danger to society. And if there are no further questions on this, I would expect for us, this court, to affirm the trial court's findings below. For these reasons and the reasons stated in our brief, thank you. Thank you. All right. Mr. Jacobs, a brief? Yes, Your Honor. The attempted kidnapping did require, I think, that he was intended to take him to a house. While it mentions other things in the statute, the house was in the information, and further, taking a crystal to a store would not satisfy the statute under People v. Gonzalez, 239 L. 2nd 471. With respect to the child abduction, it's not just the lure and a dwelling, but it's also unlawful purpose. And there's no evidence, just as there was no evidence that he had an intent to secretly confine Crystal, there's no evidence with respect to the child abduction that he had an unlawful purpose. Can you infer, though, something from the other finding of unlawful restraint and the pulling on her that there was at least a reasonable inference of an unlawful purpose, even if it's a battery? I know that that's certainly a natural inclination, and that was an inclination of the legislature. When they wrote the child abduction statute, they had that it was prima facie evidence of a presumption for an unlawful purpose just based upon kind of what you said. But that was found unconstitutional in People v. Woodrum, 223 L. 2nd 286, an unconstitutional mandatory presumption. I wasn't saying that there's a mandatory presumption. I said can't you infer an unlawful purpose from these facts? I don't think so. I think you'd be dancing on the edge of this mandatory presumption, which would be unconstitutional because there's no other indicia that he had a sexual motivation or sexual purpose. Well, if someone is pulling on someone and he's a certain age and she's an age under that, she was 13 or under 13, you're saying that you couldn't reasonably infer an attempt to pull her or take her anywhere, even if it's a foot. Oh, no. I concede that. Because you concede unlawful restraint. Exactly. I just don't concede unlawful purpose, which is child abduction. All right. Okay. Thank you, Your Honor. All right. Thank you, Mr. Jacobs. Thank you, Mr. Zutske. We want to let you know we appreciate the arguments today. It's a very complicated case and it will be taken under advisement and the court stands adjourned.